Filed 2/22/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| In re I.F., a Person Coming Under the Juvenile Court Law. | C080658 |
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>I.F.,<br><br>       Defendant and Appellant. | (Super. Ct. No. 13JW5445) |

APPEAL from a judgment of the Superior Court of Calaveras County, Thomas A. Smith, Judge. Reversed with directions.

Marcia C. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

1

Appellant I.F., then age 12, and his sister L.F., age 8, were home alone on the morning of April 27, 2013. During the course of the morning, someone entered L.F.'s bedroom and stabbed her to death. Later that day, and in the days that followed, I.F. made a series of inconsistent and cumulatively incriminating statements to police.

On May 14, 2013, a petition was filed under Welfare and Institutions Code section 602 alleging that I.F. committed murder (Pen. Code, § 187, subd. (a)),[1] and personally used a knife in the commission of the offense (§ 12022, subd. (b)(1)). Following a contested jurisdictional hearing, the juvenile court sustained the petition and found true the allegation that I.F. personally used a knife in the commission of the crime.

I.F. appeals, arguing the juvenile court erroneously admitted his pre-arrest statements in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We agree that two of four challenged statements were inadmissible. Because the *Miranda* error was not harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), we reverse and remand for further proceedings.

## I. BACKGROUND

B.F. and C.W. lived in Calaveras County with a blended family that included six children, ranging from one to 15 years of age.[2] Most of the family attended a Little League baseball game on April 27, 2013, leaving the house at approximately 7:00 a.m. I.F. and his sister L.F. stayed home.

C.W. received a call on her cell phone from I.F. at 12:06 p.m. I.F. told her that someone had come into the house, hit L.F., and then run out. C.W. and B.F. hurried home, leaving the rest of the children at the baseball field with C.W.'s grandmother. C.W. called 911 on the way home. She told the 911 operator that the children were okay,

---

[1] Undesignated statutory references are to the Penal Code.

[2] We refer to the parents by their initials to protect their privacy and the privacy of the minor children. (Cal. Rules of Court, rules 8.90 and 8.401.)

but "really scared." The 911 operator dispatched police officers to the house, and then called I.F. A recording of the 911 operator's call to I.F. was admitted into evidence at the jurisdictional hearing.

During the call, a distraught I.F. reported that he was in the bathroom when he heard a door slam. He then heard someone yelling and banging on the bathroom door. He emerged from the bathroom and saw a "Mexican" man running out the sliding glass back door. The man had long gray hair and was wearing blue "work pants" or jeans and a black shirt. Approximately 90 seconds into the call, I.F. told the 911 operator that the man "stabbed [L.F.] a bunch of times," adding, "she's like dead."

When they reached the house, I.F. was in the living room with a phone in one hand and a baseball bat in the other. L.F. was lying on the floor of her bedroom. Her legs were buckled as though she had collapsed. As B.F. approached, he saw that L.F. had a bloody cut on her forehead and blood on her shirt. When he lifted L.F.'s shirt, he saw multiple stab wounds. Although B.F. could see that L.F. was hurt, he did not know the extent of her injuries—or realize that she had been stabbed—until he lifted her shirt.

B.F. scooped L.F. up and carried her down the hall and out the front door. There, he was met by Calaveras County Sheriff's Deputy Shawn Cechini, who instructed B.F. to set L.F. down on the porch. Paramedics arrived, and determined that L.F., who was cool to the touch, had no pulse and was not breathing.

While paramedics attempted to revive L.F., Cechini spoke with I.F. I.F. told Cechini that he had been using the bathroom. He emerged from the bathroom and saw a man running towards the sliding glass back door. I.F. said that he chased the man to the back door, and then, upon hearing L.F. call out, turned around and went to check on her. As they talked, Cechini noticed that there was blood smeared across I.F.'s right forearm.

L.F.'s lifeless body was transported to the hospital. An autopsy would later reveal that L.F. suffered 22 stab wounds, mainly in the chest area. Three of the stab wounds were potentially lethal.

3

A.      *The First Interview:  At the Hospital on April 27, 2013*

Detective Wade Whitney of the Calaveras County Sheriff's Department responded to the hospital on the day of the murder.  Whitney contacted B.F. in the parking lot near the ambulance bay.  Whitney asked B.F. for permission to interview I.F., which B.F. gave.  At the time, police were trying to get additional information about the intruder, who was already the subject of an intensive manhunt.

Whitney interviewed I.F. in the airlock vestibule between the emergency room and the ambulance bay.  The exterior doors leading to the ambulance bay are equipped with a keypad combination lock.  A combination, which is known to law enforcement, is required to enter the airlock vestibule from the ambulance bay.  No combination is required to leave the airlock vestibule; the glass double doors open automatically when a person stands in front of them.  Both sets of doors, the interior doors leading to the emergency room and the exterior doors leading to the ambulance bay, were open and unlocked during the interview.

The interview lasted approximately 16 minutes.  B.F. was present the entire time.  Whitney wore his detective's uniform, which consists of a black polo shirt and khaki pants.  Whitney also wore a holstered gun and badge.  Whitney did not handcuff I.F. or direct his movements.  Whitney did not tell I.F. he was under arrest or not free to leave.

During the interview, I.F. explained that he woke up between 9:00 and 9:30 a.m. and made breakfast.  I.F. and L.F. ate and then watched a movie.  After the movie, L.F. retired to her bedroom and I.F. went to the bathroom.  While in the bathroom, I.F. heard a door slam.  He then heard someone yelling in heavily accented English, " 'Hey I know you're in here, come out.' "  He then heard L.F. scream.  Although I.F. told the 911 operator that the intruder struck the bathroom door, he did not mention this detail during his conversation with Whitney.

I.F. said that he opened the door to the bathroom in time to see a man running toward the sliding glass back door.  I.F. told Whitney that he followed the man to the

4

door, and then realized that L.F. might need help. He stopped, turned around, and ran towards his sister's bedroom, grabbing a knife from the kitchen counter, "just in case there's anyone else." When he reached the bedroom, I.F. saw L.F. lying on the floor, her shirt covered in blood. He dropped the knife, and then picked it up. He then went back to the kitchen, returned the knife to the counter, and called C.W.

Whitney showed I.F. photos of possible suspects, but none of them resembled the alleged intruder. Whitney then said, "Okay. And I'm gonna tell your dad that I wouldn't be doing my job, if I didn't ask this next question. And I will tell you, [I.F.], that you are not required to answer this question. Do you understand that? Okay. [¶] You absolutely have the right to say, 'I'm not saying a word.' And if you want . . . you know where I'm going with this, right? Okay. You do not have to answer my question, do you understand that? You're not under arrest, you're not in trouble. But I have to ask. Okay? Okay. [¶] Did you do anything to harm your sister?" I.F. said, "no." Whitney then concluded the interview. After the interview, I.F. rejoined his family in the parking lot.

B.      *The Second Interview: At the District Attorney's Office on April 27, 2013*

Later, while still at the hospital, Whitney asked B.F. for permission to interview I.F. a second time. During the hearing on I.F.'s subsequent motion to suppress, Whitney explained that the purpose of the second interview was to get more information about the intruder. No one asked I.F. whether he wanted to submit to a second interview.

B.F. drove I.F. to the district attorney's office, a short distance from the hospital. Whitney and Gary Sims, an investigator with the district attorney's office, showed I.F. to an interview room in a portable trailer near the district attorney's office. The interview room was equipped with cameras and audio recording equipment, and was accessible by means of two doors, one leading to an adjoining observation room and another leading outside. Both doors were open during the second interview, which B.F. watched via

closed circuit television from the observation room. B.F. was not allowed to join I.F. in the interview room.[3]

As before, Whitney wore a black polo shirt and khaki pants, and a holstered gun and badge. Sims wore jeans and a long sleeve shirt, with a gun and badge. Neither Whitney nor Sims handcuffed I.F. or placed him under arrest.

The second interview lasted approximately 77 minutes. At the beginning of the interview, Whitney explained: "[I.F.] we brought you here today because you witnessed or were at home when your sister was . . . seriously injured. [¶] . . . [¶] Okay. So we want to talk to you as a witness in that case. Please understand both of these doors are open, you are not under arrest, you're not being detained, you're here on your free will. So you can get up, walk out anytime you need to, if you don't want to talk to us. Your dad is in the other room okay?" Within the first fifteen minutes of questioning, a cat entered or attempted to enter the interview room from outside. Throughout the interview, Whitney, who took the lead in the questioning, encouraged I.F. to let them know if he wanted to take a break. I.F. declined all such invitations.

During the second interview, I.F. reiterated that he was in the bathroom when he heard a door open, followed by a man with an accent yelling, " 'Hey, I know you're in here, come out.' " As before, I.F. said he heard L.F. scream, and then opened the bathroom door in time to see a man running towards the sliding glass back door. I.F. estimated that he finished going to the bathroom and opened the door within 10 seconds of hearing the man's voice.

Once again, I.F. said that he chased the man to the sliding glass back door, then turned and ran towards L.F.'s room, grabbing a recently washed knife from the kitchen counter as he passed. During the second interview, I.F. emphasized that he did not enter

_____

[3] During the jurisdictional hearing, Whitney testified that B.F. was not allowed to join I.F. in the interview room because he had a tendency to answer questions for I.F.

L.F.'s bedroom, but merely observed her prone body from the doorway. He then went back to the kitchen, returned the knife to the counter, and called C.W. I.F.'s description of the intruder was consistent with the description he offered during the first interview. As before, I.F. omitted the detail about the intruder banging on the bathroom door.

After approximately 68 minutes, B.F. interrupted the interview to ask whether the detectives could "wrap it up." B.F. said that he understood the importance of allowing the detectives to ask questions, but noted it was getting late, adding "there's still a lot of chaos to deal with tonight." Whitney and Sims responded that they were almost done. Although Whitney would later testify that he would have liked to continue the interview, he concluded the questioning approximately nine minutes later. B.F. and I.F. left the district attorney's office shortly thereafter.

C.      *The Third Interview: At the District Attorney's Office on April 29, 2013*

Police interviewed I.F. a third time on April 29, 2013. That day, the family was asked to come to the district attorney's office to complete paperwork for the county's victim witness program. When they arrived, they were told that the victim witness coordinator was running late, and asked (but not ordered) to wait. While they were waiting, Calaveras County Sheriff Gary Kuntz appeared and asked B.F. for permission to take I.F. to the family home for a walk-through of the crime scene. B.F. asked I.F. if he wanted to go to the crime scene with Sheriff Kuntz, and I.F. said no. B.F. and police respected I.F.'s wishes.

Later, Whitney appeared and asked the family to provide DNA samples, which were taken by swabbing the insides of their cheeks. While collecting the samples, Whitney explained that police wanted to conduct additional interviews, including another interview of I.F. B.F. consented to the request, instructing I.F. to "speak clearly" during the interview.

The third interview was conducted by Sergeant Tim Sturm and Detective Josh Crabtree of the Calaveras County Sheriff's Department. The interview took place in the

7

interview room described above. The doors were unlocked, but closed. Both detectives wore black polo shirts emblazoned with sheriff's stars and khaki pants. Neither carried a weapon. I.F. was not handcuffed or placed under arrest.

The third interview lasted approximately 84 minutes. During the interview, I.F. largely repeated the sequence of events described above, with two significant variations. First, he reintroduced the idea that the alleged intruder had been banging on the bathroom door, a detail he omitted from the first and second interviews. Second, he made no mention of the knife he previously claimed to have grabbed from the kitchen counter.

After approximately 42 minutes of non-confrontational questioning, Sturm introduced the subject of DNA evidence, asking, "Do you think that . . . if we get the DNA from the right person it'll help us solve this crime?" Moments later, following a brief discussion of television crime shows and the blood evidence in L.F.'s room, Crabtree said, "So there's a couple things that . . . that we know and that we . . . I think maybe you . . . you've forgotten and I can understand that cuz this is a really big thing right? And so there's a couple things that we know about and I want to give you a few minutes to kind of just relax okay? Cuz I could tell you're upset and just think about some stuff and then we're gonna come back in okay? And then we . . . shouldn't be much longer. Okay? But just remember there's things that we know, that we need you to remember them cuz it's really important. Okay? So we'll be right back." Crabtree and Sturm then readied themselves to leave the room. As they did so, Sturm asked, "You need anything? You want me to open the door? You want to step outside or anything?" I.F. demurred. Sturm and Crabtree left the interview room, closing the door behind them.

The interview resumed after a brief interlude, during which I.F. sat virtually motionless in his chair. Sturm apologized for the interruption, stating, "We're going to . . . we're going to not take a break too long because you got family okay? So at the end of this, you [get] to take off out of here with your family." Sturm and Crabtree then allowed, in empathetic tones, that they had both made mistakes as young people, which

had been forgiven. Following a discussion of the therapeutic benefits of unburdening one's conscience, Sturm said, "No matter what does get said today, you . . . you leave with your parents no matter what. And when I say, 'No matter what[,]' I mean anything. Okay? Ev . . . anything, you leave with your parents and you get to walk out [of] here and be with your mom and dad and help them through this. Okay?"

Sturm then returned to the subject of forensic evidence, leading to the following exchange:

"[STURM:]   They're still collecting evidence and the thing about the evidence is . . . is that it tells the truth. And that's why we . . . and that's why we hope that everyone involved in the investigation also tells the truth. And . . . and again, when I look at you, I can tell that I . . . I think that you . . . I think that you want to tell the truth with us. Because I . . . I think that there's a . . . there's a part of this that sits just right here. It's right at that back . . . back of your tongue and it's just not quite coming out yet.

"[CRABTREE:]     I can tell by looking at you, that you have something on your mind. Can you just tell us?

"[I.F.:]          Um . . . .

"[STURM:]   You are going home with your mom and dad today. Okay? But we need to know. There is no man that ran out of that house is there?

"[I.F.:]          Yeah there is[,] I saw him."

Shifting gears, Sturm confronted I.F. with the 911 recording, asking how I.F. could have known that L.F. had been stabbed without entering the room, when B.F. was not aware that she had been stabbed until he examined her closely. I.F. responded, "I don't know I . . . I could have seen it I guess."

In the meantime, B.F., who was waiting outside, was growing increasingly agitated. As B.F. would later testify, the family had not planned on spending the day at the district attorney's office. Rather, the family expected to complete the paperwork for the victim witness program and be on their way. As the interview wore on, B.F. began to

feel as though he had been summoned to the district attorney's office under false pretenses.

B.F. knocked on the door of the trailer, which was closed and locked. One of a number of law enforcement officers in the observation room opened the door. B.F. asked, " 'How much longer? Is my son okay?' " The officer responded, " 'Yes, he is fine. . . . Just be patient.' " B.F. waited approximately 25 minutes, and then knocked a second time. A law enforcement officer opened the door, and B.F. asked, " 'Why is it taking so long?' " The officer responded, " 'Just a couple more minutes,' " and closed the door again. B.F. continued to wait.

Back in the interview room, Crabtree and Sturm stepped up their efforts to elicit a confession. They intimated that they already had DNA evidence establishing I.F. as the killer, and then pressed for an "explanation" or "reason" for the crime. They challenged I.F.'s account of the events surrounding the murder, saying, "the evidence tells us, obviously there was something bad that happened in that house. And the evidence doesn't tell us that there was a man, a great big man running through your house, with you." They urged I.F to admit his "mistake" so that he could "move[] on" and "feel better." They assured I.F. that his parents would love him "no matter what." I.F.'s responses—to the extent he responded at all—were short and frequently inaudible.

Outside, B.F.'s patience was growing thin. He knocked on the trailer door a third time. A law enforcement officer opened the door and said, " 'a couple minutes,' " and then summarily closed the door, without giving B.F. an opportunity to speak. B.F., now furious, immediately knocked a fourth time, telling the officer that he " 'wanted to take [I.F.] and leave.' " B.F. was then admitted into the observation room.

In the interview room, Crabtree confronted I.F. with Cechini's observation that there had been blood on his forearm on the day of the murder. As Crabtree questioned I.F., Sturm received a message instructing him to leave the interview room. Sturm excused himself, closing the door behind him. In the observation room, Sturm learned

10

that B.F. wanted to end the interview. Following a two-minute absence, Sturm returned to the interview room, saying, "All right, we are done." Crabtree promptly terminated the interview, and I.F. left the district attorney's office with his family. By the end of the third interview, Crabtree had come to view I.F. as a suspect.

*D.*     *The Fourth Interview:  At the District Attorney's Office on May 9, 2013*

Captain Jim Macedo of the Calaveras County Sheriff's Department telephoned C.W. on May 8, 2013. Macedo told C.W. that police wanted to conduct separate interviews of each of the family's surviving children. Specifically, he explained that police wanted to show the children photographs of known sex offenders and discuss family dynamics, such as which children played where, and with whom. Macedo added that police prefer to interview children without parents present, as they tend to be more forthcoming. C.W. and B.F. were concerned that being left alone for police interviews might be too hard on the children, who were understandably traumatized by the death of their sister. They agreed to the interviews on the condition that one or the other must be allowed to observe.

The family appeared at the district attorney's office the following day, May 9, 2013. B.F. and C.W. met with Macedo and Special Agent Chris Campion of the Federal Bureau of Investigation (FBI). Campion renewed Macedo's request to interview the children individually, without parents present. B.F., sensing that Campion was attempting to renege on the bargain he struck with Macedo, became irate. He told Campion and Macedo that "he knew he didn't have to be there, that he chose to be there on that date and bring his family down, [and] that he could leave at any time." Shortly thereafter, B.F. got up and left the room, with C.W. in tow. He collected the children, saying, " 'Let's go, we're leaving." Together, the family left the district attorney's office and headed to their car. Macedo intercepted them in the parking lot. Following a brief discussion, B.F. and C.W. agreed to stay on condition that they would be allowed to

11

observe the interviews, and Campion, who had offended B.F., would not be allowed to participate.

The interviews took place in two locations: the above-described interview room and another interview room in the Cal Works building, approximately one mile away. To Macedo's surprise, B.F. announced that C.W. would observe the interview of I.F., which was to take place in the interview room, while B.F. would observe the interview of another child in the nearby Cal Works building. As she ascended a ramp leading to the door of the trailer, C.W. turned around, expecting to see I.F. following her. Instead, she saw two law enforcement officers, a man and a woman, flanking I.F., and walking him around the building. I.F. was not surrounded by uniformed officers, handcuffed, or moved at gunpoint. Nevertheless, C.W. became alarmed. She called out, " 'Where are you guys taking him? This wasn't agreed to. He's supposed to be here.' " One of the officers responded that they were bringing I.F. into the trailer by means of another entrance. C.W. saw I.F. again a short time later once officers in the observation room got her viewing screen turned on, at which point the interview had already commenced. The incident made her uncomfortable.

The fourth interview proceeded in two parts, both of which were conducted by Crabtree and Special Agent Sam Dilland of the FBI. Crabtree wore a button-down shirt and tie, with dress slacks, but no jacket. He did not carry a gun or badge. Dilland wore a suit. The record does not disclose whether Dilland carried a gun or badge; however, nothing suggests that she presented herself in a manner that would have been likely to intimidate a young person.

The first part of the fourth interview lasted approximately 97 minutes. The interview took place in the interview room, with the doors unlocked. The record is ambiguous as to whether the doors were open or closed. During the jurisdictional hearing, Crabtree testified that the exterior door continuously opened and closed due to wind. On the video recording, Dilland can be seen standing as she says, "It's getting

warm in here, (inaudible) door open a little bit." Later, Crabtree can be seen standing to close a door. Although Crabtree testified that the interior door leading to the observation room was unlocked, neither Crabtree nor anyone else testified that the interior door was open. On this record, we assume that the exterior door was open at some points and closed at others, while the interior door remained closed.

Dilland began the interview by acknowledging that I.F. had already discussed the events in question with Crabtree, adding, "If you don't want to answer a question, just tell me. 'Sam I don't want to answer it.' That's fine. Okay? If you don't know an answer say, 'Hey I don't . . . I don't know' and that . . . and that's fine also."

Dilland then engaged I.F. in small talk on a variety of subjects, including school, video games, movies, friends and family. After approximately 27 minutes, Dilland rose and opened the door. Shortly thereafter, Crabtree and Dilland, speaking over one another, said:

"[CRABTREE:]      You know there's a door there and you know that door's open so . . .

"[DILLAND:]      Yeah.

"[CRABTREE:]      if you want bam, you just

"[DILLAND:]      Yeah

"[CRABTREE:]      leave you alone."

I.F. nodded slightly, but did not say anything.

Dilland then turned to the events of April 27, 2013. As before, I.F. said that he woke up and prepared breakfast for himself and L.F. I.F. and L.F. ate breakfast, and then watched a movie. After the movie, L.F. went to her room. I.F. said that he could not recall what he did immediately after the movie, but he eventually went to the bathroom. While in the bathroom, I.F. said that he heard a door slam, and then a man yelling, " 'Hey, I know you're in here, come out.' " When asked whether the man "was banging" or "just yelling," I.F. responded, "Just yelling."

13

I.F. said that he heard his sister scream, then quickly finished up in the bathroom and opened the door in time to see a man run towards the sliding glass back door. I.F. said that he chased the man to the door, then remembered L.F. and ran towards her room, stopping at the doorway. I.F. said that he saw L.F. lying on the floor, her shirt bloody. He then called C.W. I.F. did not say anything about a knife.

Throughout the interview, Dilland acknowledged how difficult her questions were, noting that they required I.F. to relive the day of the murder. At one point, as Dilland expressed her appreciation for I.F.'s willingness to answer questions, a door appears to have opened, and Crabtree rose to close it. Moments later, following a brief discussion of the 911 call, Dilland sympathized, "I can tell it's hard for you to talk about. You know and it's understandable." She sought and received confirmation that I.F. was okay before proceeding.

Dilland then turned to the status of the investigation. She explained that police had been canvassing the neighborhood, noting the presence of a map on the wall behind her. At Dilland's invitation, I.F. stood up and crossed the room so that he could find his house on the map. Having done so, he returned to his seat.

Dilland and Crabtree explained that police interviewed all the neighbors, but no one had seen anyone matching the description of the alleged intruder. Following a brief discussion of television crime shows, Dilland volunteered that there was no forensic evidence of an intruder, stating, "And in . . . in all of the work that has been done over the past two weeks, there is . . . there's been no evidence that we found of somebody leaving, the way that . . . the way that you're saying."

Following an extended silence, Crabtree added that police had not found any tire tracks leading away from the house either. Following another extended silence, Dilland said, "You know and we're . . . we're trying you know we're looking at . . . for ways to explain [the absence of evidence of an intruder]. Can . . . and really it's we have a lot of evidence pointing to another story."

14

Following yet another extended silence, Dilland continued, "So we had . . . so we did the neighborhood search, they're talking to everybody, looking you know, we had . . . we had blood dogs in looking at concealed blood and going through to try to track and they didn't see the blood out of the house. There are no fingerprints in the house. No . . . and we understand that you know accidents happen. Things happen. You know and so we just kind of look at your story and see if there's anything that you know you can add."

When I.F. answered in the negative, Crabtree showed I.F. a photograph of a Ghostbusters T-shirt that was recovered from the crime scene. Moments later, the following exchange took place:

"[DILLAND:]        You know how . . . how I'm talking about the dogs that came in?  Like the blood dogs that can kind of follow the scent of it around?  They . . . they were in [L.F.'s] room and then they moved went to your room and they went to the hamper (inaudible) hamper and that shirt was what they signaled on.

"[I.F.:]        I could have changed I guess I don't remember.

"[DILLAND:]        Okay.  Tell me about the change.  Like what did you change?

"[I.F.:]        I don't know I probably changed after I see her or something, when I went . . .

"[DILLAND:]        Okay so you changed, so you think you may have changed after you saw her?

"[I.F.:]        Yes I . . . maybe.

"[DILLAND:]        Okay.  So . . . so you would have changed because?

"[CRABTREE:]        Is this . . . is this getting hard?  You can go whenever you want okay?  But . . . but we are asking for your help.  Because if we don't have your help we don't have anybody's help at all.  And then we don't want to have . . . so you think he changed?  Or you changed?

"[I.F.:]        I don't know yeah.  I . . . I . . . ."

15

Before I.F. could finish, the door opened and C.W., who had been watching on the monitors in the adjoining observation room, said, "Come on." I.F. quickly rose from his chair and left the room, bringing the first part of the fourth interview to an end.

During the hearing on I.F.'s subsequent motion to suppress, C.W. explained that she grew increasingly alarmed as she watched from the observation room. C.W. recalled that she watched with Calaveras County District Attorney Barbara Yook and several detectives. The audio function on the closed-circuit television system was not working properly, so the volume was turned down low, making it hard to hear the interview. From C.W.'s vantage point, I.F. seemed "very stressed" and "nervous," as though "he was going to crawl out of his chair."

After some time, C.W. announced that she wanted to end the interview. Yook responded, "[Y]ou know, he's free to go[.] [H]e's not being held against his will." C.W. replied, "[H]e's not free to go, he's a 12[-]year old child in a room with closed doors and officers, he doesn't understand that point." Moments later, one of the detectives said, "he looks relaxed now, can we carry on?" C.W. reiterated that she wanted to end the interview, but no one made a move to help her.

When Crabtree confronted I.F. with the photograph of the bloodstained T-shirt, C.W. realized for the first time that police viewed I.F. as a suspect, not a witness. C.W. said, " 'Is somebody going to end it or am I going to end it?' " Again, no one moved. Taking matters into her own hands, C.W. went into the interview room and retrieved I.F. No one attempted to stop her.

C.W. and I.F. left the district attorney's office. C.W. asked to be taken to where B.F. was. Macedo met C.W. and I.F. in the parking lot, and escorted them to the Cal Works building. There, they met Deputy Sheriff Heather Gordon of the Calaveras County Sheriff's Office. Gordon asked C.W. why she ended the interview. C.W. responded that she now realized I.F. was a suspect, and felt that it was not her place to

16

decide whether the interview should continue, since she is not I.F.'s guardian. C.W. asked Gordon to fetch B.F., which she did.

B.F. and C.W. spoke with Gordon at the Cal Works building. Gordon urged B.F. to allow the interview to continue, volunteering that evidence collected during the investigation pointed to I.F. B.F. agreed to continue the interview on the condition that he be allowed to confront I.F. As Gordon would later testify, "He explained that he needed to be the one to confront I.F. with the information and was insistent to the fact— to the point that either he was able to do that and confront him with the [incriminating] information or it was not going to continue." B.F., for his part, explained that he agreed to continue the interview because he "wanted answers" and believed he was the only one who could get them. As B.F. would later testify, "I always know when he's lying or hiding something, so I told [police] I can get [the truth] out of him if he's hiding it."

Gordon communicated B.F.'s terms to the law enforcement team at the district attorney's office. The law enforcement team agreed to continue the interview with B.F. taking the lead. I.F. does not appear to have participated in any of these conversations. C.W. drove I.F. back to the trailer near the district attorney's office. B.F. chose to ride in Gordon's patrol car.

C.W. and I.F. rejoined B.F. and Gordon in front of the district attorney's office. Upon seeing B.F., I.F. became emotional and Gordon opined that he was on the verge of admitting guilt.[4] B.F. asked I.F. whether he wanted to go back inside, saying, "we need to go back in and talk about this, do you want to go back in and talk about this and get to the bottom of it." I.F. said no. B.F. insisted, saying, "we need to get to the bottom of

---

[4] It is not clear from the record whether Gordon offered this opinion in I.F.'s presence.

this, we need to find out what happened."[5] B.F., C.W. and I.F. then joined Dilland and Crabtree in the interview room.

The second part of the fourth interview was an emotional encounter that lasted approximately 43 minutes. Following introductions, B.F. asked, "Is there a recorder or I can just talk?" Crabtree responded: "Well we . . . we are gonna be recorded but I want to let you know, no matter what happens today okay? You guys are gonna leave this building. All three of you, okay? We . . . you . . . you're free to go at any point. You don't want to talk about anything, you just stop and get up and go." After stressing the importance of open and honest communication, Crabtree reiterated, "So you guys understand at any point you guys can get up and just walk out of here. Okay? No matter what happens, you guys are all still gonna leave here. Okay? Do you understand that B.F.?" B.F. responded in the affirmative.

Crabtree outlined the evidence against I.F., noting that "we have no evidence that there was anybody else in that house, at all." B.F. then addressed I.F., stating, "Okay. This is the deal, they have evidence that it points back to you. So what I want to know or what I want us to talk about is that for some reason there was an accident and for some reason you, did hurt your sister, you got to talk to him. Now just tell him yes you did it and what the deal is. We can't move forward with this, without you either admitting to it that you did it or they're gonna get their evidence together and they're still gonna come and eventually arrest you and it's gonna be a big scene." I.F. responded that he didn't remember anything.

Later, a tearful B.F. urged I.F. to come clean, saying, "If it's bad enough I lose one kid, if you did this, then I'm gonna lose you for a while. Okay? I'm not saying I'm gonna hate you and never talk to you. But I need to know why, if . . . if this is what's

---

[5] It is not clear from the record whether this exchange occurred in Gordon's presence.

18

going on. There's no proof of nobody being in the house but you and your sister. Like I said, I told um don't arrest you unless they're a hundred percent positive. So they're gathering evidence. If it's something you did, you have to talk to um. If you lie to me, and hide shit, you know that's when I don't support you, right? If you're honest and talk to um . . . I'll . . . I don't know if your family mad at you, if you're afraid that you're going to disappoint me, don't worry about none of that. You know I love both you guys very much. I've been telling you that for year[s], right? We're here to take care of you right or wrong. Okay? So you need to talk to them. If you [did] something they need to know, so they can move forward. Can't move forward until you talk to um." I.F. responded that he didn't do it.

Crabtree then took over the questioning, urging I.F. to "be honest about what happened" and adding, "your dad is sitting here right now telling you that he's gonna [forgive] you but you [got] to tell the truth. And if it comes down to the other way, where we got to show why we know what we know, you know it doesn't sound like he's gonna be so forgiving on that side." Moments later, Dilland interjected, observing that "people make mistakes" and saying, "we just want to know your story and what happened." I.F. shook his head slightly and said, "I don't (inaudible)." The following exchange then took place:

"[DILLAND:]     It's . . . it's okay. I mean your . . . your dad's here, [C.W.]'s here. They . . . they love you very much. They want what's best for you. You know they . . . they want to get you help; they . . . they want to figure out. They want . . . they want to know what happened to [L.F.]

"[I.F.:]     I can't remember[.]

"[DILLAND:]     You don't remember okay. Okay. From . . . from what point don't you remember?

"[I.F.:]     I don't remember doing it. But I guess I did, I don't know."

19

Dilland and Crabtree confronted I.F. with the absence of evidence of an intruder and that a Ghostbusters T-shirt with blood on it had been found in I.F.'s hamper. I.F., now crying, insisted he did not remember anything. Speaking softly, B.F. encouraged I.F., saying, "Start to talk son, just got to be honest." When I.F. repeated that he did not remember, Crabtree said, "You leave here today no matter what happens. I promise you that. You leave with your mom and dad no matter what you tell us. But you've got to explain stuff."

Crabtree confronted I.F. with the transcript of the 911 call, noting that I.F. knew that L.F. had been stabbed, despite the fact that he claimed not to have entered her room. Crabtree also noted that I.F. did not ask the 911 operator for an ambulance until B.F. and C.W. arrived. Following an extended silence, B.F. asked, "You gonna talk to um?"

For the next several minutes, I.F. sat gripping the sides of his chair and staring fixedly at the floor. He sniffled continuously and appeared to be fighting tears. Crabtree and Dilland spoke in soft, soothing tones, offering assurances that B.F. would not be angry. B.F., for his part, quietly and calmly urged I.F. to "be honest." After more than fifteen minutes, much of which passed in near silence, save the sound of his sniffling, I.F. began to cry. B.F. rose from his chair and put an arm around I.F. I.F. stood and embraced his father, weeping. The interview came to a pause as B.F. consoled a sobbing I.F. Crabtree and Dilland rose and appeared to briefly leave the interview room. When they returned, Crabtree urged I.F. to continue the interview, stating, "It's all got to be laid out. And your dad is not . . . he's not gonna be mad." B.F. interjected that he was not mad, adding, "Come on let's go, get this out." Crabtree responded, "You guys are free to do whatever you want. Like I said, you guys all want to leave together, yeah we're not going to keep you here."

Following an informal discussion of the likelihood that I.F. would be tried as a juvenile, Macedo entered the interview room. After introducing himself, Macedo said, "I know it's tough being twelve to understand how important this is. And your family

20

clearly understands how important this is.  But we really need you to talk to us and just tell us the truth of what happened bud.  Okay?"  Macedo continued, "I need you to be brave for me okay?  Can you do that for me?  And I need you to talk.  I know it's tough but I need you to talk."  Macedo then left the room.

Crabtree said, "[I.F.], you think you can talk about it?"  I.F., now out of frame, responded, "I don't remember."  Moments later, B.F. said, "We're done."  The interview came to an end and B.F., C.W. and I.F. left the district attorney's office together.  I.F. was arrested two days later, on May 11, 2013.

E.      *Juvenile Court Proceedings*

On May 14, 2013, a wardship petition was filed pursuant to Welfare and Institutions Code section 602, alleging that I.F. had committed an act which would be a crime if committed by an adult.  Specifically, the petition alleged that I.F. committed murder (§ 187, subd. (a)), and personally used a knife during the commission of the offense.  (§ 12022, subd. (b)(1).)  I.F. denied the allegations.

On June 9, 2014, I.F. filed a motion to suppress his statements to police during the four interviews on Fourth Amendment grounds.  On June 23, 2014, the juvenile court denied the Fourth Amendment motion, stating, "The court finds that each of the four separate interviews that are the subject of this matter were given entirely with the consent of the father, as well as the minor himself.  It was never—when the consent was withdrawn in these cases, all interviews had stopped."[6]

A contested jurisdictional hearing took place over thirteen days from September 15 through October 6, 2015.  On the first day of the hearing, I.F. filed another motion to suppress, arguing the statements were made during custodial interrogations without the required *Miranda* warnings.   Following the close of evidence, the juvenile court denied

---

[6] I.F. does not challenge the denial of the motion to suppress under the Fourth Amendment.

21

the *Miranda* motion, stating, "I'll find that *Miranda* does not apply to any of the four interviews in this case. The minor was simply not in custody. *Miranda* only applies when there is an in-custodial interrogation designed to elicit the incriminating statement. This was not an in-custodial interrogation. [I.F.] repeatedly was told in each of these four interviews that he could terminate at any time, he could leave at any time he wanted. He was shown the exits. A cat came in the one open door. So I find, again, that there was no *Miranda* violation."[7] (Italics added.) The juvenile court then heard closing arguments.

During closing argument, the prosecutor relied extensively on the inconsistencies in I.F.'s various statements to police. The prosecutor outlined the discrepancies in I.F.'s statements, offering a chart purporting to illustrate how I.F.'s story changed over time. The prosecutor emphasized the "glaring differences, such as the banging on the door, that seems to come and go, and very significantly . . . the knife." The prosecutor also argued that I.F. made "some very interesting admissions" in the course of the interviews, namely: (1) I.F.'s concession during the third interview that he "could have seen" L.F.'s bloody body before speaking with the 911 operator; (2) I.F.'s concession in the first part of the fourth interview that he "could have changed" his T-shirt; and (3) I.F.'s concession in the second part of the fourth interview that, "I don't remember doing it. But I guess I did, I don't know."

The prosecutor also relied on evidence that the murder weapon was a kitchen knife recovered from the family home. Although the knife was new, there was evidence the blade had been damaged and blood matching L.F.'s DNA profile was found in the space

___

[7] As we shall discuss, substantial evidence does not support the juvenile court's finding that I.F. was "repeatedly told in each" of the four interviews that he could terminate and leave.

22

between the metal tang of the blade and the handle.[8]  The prosecutor also emphasized the existence of other blood evidence pointing to I.F., including traces of L.F.'s blood on I.F.'s Ghostbusters T-shirt, traces of L.F.'s blood on sneakers worn by B.F. and I.F. to do yard work, and the absence of evidence supporting I.F.'s story that an intruder broke into the house and murdered L.F.

Defense counsel countered that I.F.'s pre-arrest statements, though inconsistent in some respects, were consistent in I.F.'s denials of guilt.  Defense counsel argued that the prosecution was engaged in an unfair parsing of I.F.'s statements, suggesting that any inconsistencies could be explained by the fact that the statements were made by a child who had just experienced a traumatic event.  Defense counsel found nothing significant in the fact I.F. told the 911 operator that L.F. had been stabbed, noting that he could have inferred as much from the sounds he heard in the bathroom and the sight of L.F.'s bloody body.

Defense counsel dismissed the prosecution's forensic evidence as ambiguous, noting that Medical Pathologist Robert Lawrence originally excluded the damaged knife as the murder weapon, but subsequently revised that conclusion at the prosecution's request.  Defense counsel also stressed the absence of forensic evidence tying I.F. to the crime.  Although there were traces of L.F.'s blood on the Ghostbusters T-shirt and the tang of the knife, defense counsel maintained that the stabbing would have produced large quantities of blood spatter and cast-off blood, such that "the killer had to have blood all over them."  And even assuming the blood could have been cleaned up, defense

---

[8] Webster's Third New International Dictionary defines "tang," in part, as "a piece that forms an extension from the blade or analogous part of an instrument (as a table knife or fork, file, chisel, or sword) and connects with the handle and that may be a thin flat plate on each side of which a rounded piece is secured to form the handle or that may be a tapered piece inserted in the haft or handle."  (Webster's Third New Internat. Dict. (1993) p. 2336, col. 3.)  The knife believed to have been the murder weapon had a full metal tang.

23

counsel argued, there should have been evidence of a clean up, such as "bleach-soaked cloths or towels." And even then, defense counsel continued, the defense had presented expert testimony that such a clean up would have been beyond the abilities of most 12 year olds, particularly one with I.F.'s hygiene and organizational skills. Defense counsel also noted that there were stains on the outside of the knife containing DNA attributable to multiple contributors (including I.F. and L.F.), suggesting that the knife was not part of a clean up effort.

Defense counsel also pointed to the existence of evidence supporting an intruder theory. Of greatest significance, defense counsel noted that a long hair had been found on the surface of L.F.'s skin, near the cleft of her buttocks.[9] A male DNA profile was obtained from the root of the hair. The DNA was not identified, and was likely deposited by way of some bodily fluid, such as blood, semen, or saliva. Defense counsel also noted that two latent fingerprints had been recovered from the doorframe leading to L.F.'s room. Although the prosecution suggested that the fingerprints may have been L.F.'s, they were never conclusively matched, raising the possibility that they may have been left by an intruder. Defense counsel also noted that there had been several reports of suspicious people in the area around the time of the crime, though none of those people matched I.F.'s description of the intruder.

Following closing arguments, the juvenile court ruled from the bench, stating, "We have before us a very bright young man. He is the top 10 percent of the intelligent students in his class, although he is an underachiever. [¶] He has given numerous inconsistent statements." The juvenile court touched upon some of the inconsistencies in I.F.'s statements, reiterating that I.F. "told several stories about what happened." The juvenile court concluded that the evidence of L.F.'s blood inside the damaged knife was

---

[9] During the jurisdictional hearing, criminalist Gordon Wincott testified that the hair belonged to L.F.

24

"the strongest evidence because the statements of [I.F.] just don't make sense."
Accordingly, the juvenile court found the allegations of the petition true beyond a
reasonable doubt.

At the dispositional hearing, I.F. was made a ward of the court and committed to
the Department of Corrections and Rehabilitation, Division of Juvenile Justice, for a
maximum of 16 years to life, with credit for 908 days.

I.F. filed at timely notice of appeal.

## II.  DISCUSSION

I.F. argues the juvenile court erred in refusing to suppress his statements to police.
Specifically, he argues the statements should have been suppressed because (1) the
interviews constituted custodial interrogations within the meaning of *Miranda*, and (2) as
the father of the victim, B.F. was burdened by a conflict of interest that rendered him
incapable of adequately protecting I.F.'s legal interests.  I.F. also argues that the juvenile
court erred in refusing to admit exculpatory polygraph evidence over the prosecution's
objection.

We conclude that the third and fourth interviews were custodial and should have
been suppressed.  We reject I.F.'s argument that B.F.'s conflict of interest required the
suppression of his pre-arrest statements, and decline to reach his argument that the
juvenile court should have admitted the polygraph evidence.

### A.    *Miranda*

Police officers are not required to give *Miranda* warnings to everyone they
question.  (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.)  Rather, an officer's
obligation to administer a *Miranda* warning arises only when a person is "in custody."
(*Ibid.*)  " 'Absent "custodial interrogation," *Miranda* simply does not come into play.' "
(*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)  For purposes of *Miranda,* a person is in
custody when there is " 'a "formal arrest or restraint on freedom of movement" of the
degree associated with a formal arrest.' "  (*Thompson v. Keohane* (1995) 516 U.S. 99,

25

112, superseded on other grounds by statute, 28 U.S.C. § 2254(d); *People v. Ochoa, supra,* at p. 401.)  But he is not in custody if, under the circumstances, " ' a reasonable person in [his] position would have felt free to end the questioning and leave.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

"Custody determinations are resolved by an objective standard:  Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest?  [Citations.]  The totality of the circumstances surrounding an incident must be considered as a whole." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403, fn. omitted.)  Courts have identified a variety of circumstances to be considered as part of the custody determination.  Among them are "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.  [Citations.]  [¶]  No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*).)

In juvenile cases, the same factors still apply, but with an added consideration. In *J.D.B. v. North Carolina* (2011) 564 U.S. 261 (*J.D.B.*), the U.S. Supreme Court concluded that a child's age may be considered in the *Miranda* analysis, "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer." (*Id.* at p. 277.) The Court recognized that, "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." (*Id.* at p. 272; see also *Haley v. Ohio* (1948) 332 U.S. 596, 599 [in the context of police interrogation, events "[t]hat would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens"].) Although age may not be a significant factor in every case, the Court observed, common sense dictates that "children cannot be viewed simply as miniature adults." (*J.D.B., supra,* at pp. 262 & 274.) Accordingly, the Court concluded that "a child's age properly informs the *Miranda* custody analysis." (*Id.* at p. 265.) Here, the parties appear to agree that police were aware of I.F.'s age at the time of the interviews. We therefore take I.F.'s age into consideration in deciding whether he would have felt free to leave. (*Id.* at p. 277.)

### B. Standard of Review

The custody inquiry presents a mixed question of law and fact. (*People v. Moore* (2011) 51 Cal.4th 386, 395.) The trial court's factual findings regarding the circumstances surrounding the interrogation are reviewed for substantial evidence and we independently decide whether, given those circumstances, a reasonable person in minor's position would have felt free to end the questioning and leave. (*Ibid.*) The prosecution bears the burden of proving that the defendant was not in custody in order to use his statements against him. (*People v. Ochoa, supra,* 19 Cal.4th at p. 401.)

### C. B.F.'s Conflict of Interest

Before we examine the circumstances surrounding each interview, we consider I.F.'s argument that his father, having lost a child, was burdened by an intolerable

27

conflict of interest. I.F. raises two alternative arguments with respect to B.F.'s conflict of interest. First, he argues the conflict of interest must be factored into our consideration of the totality of the circumstances. Second, he argues that B.F.'s conflict of interest effectively deprived I.F. of rights guaranteed by the Fifth, Sixth and Fourteenth Amendments. We consider these arguments momentarily.

We can easily see how a grieving parent's search for answers could bring him into conflict with his child. A parent who has lost a loved one as a result of a crime, as B.F. did, might be powerfully motivated to encourage cooperation with police where another parent might counsel silence. (See Farber, *The Role of the Parent/Guardian in Juvenile Custodial Interrogations: Friend or Foe?* (2004) 41 Am. Crim. L.Rev. 1277, 1294 (Farber) [observing that, in situations where the parent or other interested adult has a relationship with the victim, "the adult may operate, consciously or subconsciously, as more of a fact-finder or inquisitor in order to determine how her loved one was harmed"].) By encouraging cooperation, such a parent could unwittingly interfere with the thoughtful exercise of the child's constitutional rights, or even contribute to a false confession.

There may be other circumstances in which a parent might be motivated to encourage cooperation with police to the detriment of his child's legal interests. For example, the parent may be the victim of the crime, or may himself be a suspect. (See Farber, *supra,* 41 Am. Crim. L.Rev. at p. 1295.) Less obviously, a parent may urge cooperation with law enforcement as a matter of moral responsibility. (*Id.* at p. 1305.) Some parents, believing their children to be innocent, may encourage cooperation out of a desire to promote good citizenship or to aid in the investigation of a crime. Others, believing their children to be guilty, may urge cooperation out of a desire to teach their children life lessons about personal responsibility or respect for authority. Suffice to say, there may be any number of circumstances in which a parent may urge cooperation with

28

law enforcement, raising the possibility that the parent's interests may conflict with those of his child given the adversarial structure of our criminal justice system.

Parental conflicts of interest pose a unique challenge in the interrogation setting, where children are especially vulnerable. Children " 'generally are less mature and responsible than adults,' . . . they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,' . . . they 'are more vulnerable or susceptible to . . . outside pressures' than adults" (*J.D.B., supra,* 564 U.S. at p. 272), they "have limited understandings of the criminal justice system and the roles of the institutional actors within it" (*Graham v. Florida* (2010) 560 U.S. 48, 78), and they "characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them" (*J.D.B., supra,* at p. 273; see also *In re Elias V.* (2015) 237 Cal.App.4th 568, 588 (*Elias V.*) ["children and adolescents are much more vulnerable to psychologically coercive interrogations and in other dealings with the police than resilient adults experienced with the criminal justice system"]).

Recognizing that children are especially vulnerable to suggestive questioning, some jurisdictions have adopted special safeguards requiring the presence of a parent or adult ally in custodial interrogations. (*In re Joseph H.* (2015) 367 P.3d 1, 4-5 (review den., dis. statement of Liu, J.) [collecting cases and statutes].) These safeguards, whether statutory or jurisprudential, generally assume that parents will play a supportive role in custodial interrogations, acting as a buffer between the child, on the one hand, and police, on the other. (See, e.g., *State v. Presha* (2000) 163 N.J. 304, 314 [748 A.2d 1108, 1113] ["The role of a parent in the context of a juvenile interrogation takes on special significance. [Citation.] In that circumstance, the parent serves as advisor to the juvenile, someone who can offer a measure of support in the unfamiliar setting of the police station"].)

29

But it is also true that parents can play a coercive role in custodial interrogations. (See, e.g., *State ex rel. A.S.* (2010) 203 N.J. 131, 136 [999 A.2d 1136, 1138] [holding the minor's confession inadmissible where her adoptive mother, whose grandson was the victim of the offense, misstated the minor's rights when police had her read them to the minor, badgered the minor in front of police and "became a de facto agent of the police"]; *In re D.W.* (1982) 108 Ill.App.3d 1109, 1111 [440 N.E.2d 140, 141] [holding the minor's confession inadmissible where his mother "was used as an agent of the police" and insisted he tell the police what happened].) Thus, the mere presence of a parent may be insufficient to protect a child's legal interests, as presence alone does not guarantee that the parent will act with the child's interests in mind. (*State ex rel. A.S., supra,* at p. 1146.)

"Whether a child likes it or not, parents have broad authority over their minor children." (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1410.) Parents can "direct and control" their children's activities (*ibid.*), compel their attendance at school (Ed. Code, § 48293), and decide who may spend time with them (*Brekke v. Wills, supra,* at p. 1410). It requires no stretch of judicial imagination to see that a parent's broad authority could easily extend into the interrogation room, combining with police authority to produce a coercive atmosphere. Where, as here, a parent labors under a serious conflict of interest, the risk of coercion is even greater.

I.F. argues that his father's conflict of interest must be considered in determining whether a reasonable child in I.F.'s position would have felt free to leave the interviews. Although the People argue that B.F. was not an "agent" of the police (a point we take up later), they do not appear to dispute the relevance of B.F.'s conflict of interest to our examination of the totality of the circumstances. We observe that courts routinely consider the presence or absence of a parent or guardian in deciding whether an interrogation is custodial. (See, e.g., *Alvarado v. Hickman* (2002) 316 F.3d 841, 851, revd. on other grounds *sub nom. Yarborough v. Alvarado* (2004) 541 U.S. 652 ["the issue

of parental involvement, at the behest of police officials, to arrange the police interview with [the minor] and the subsequent refusal by police to let his parents attend the interview are certainly relevant issues in the totality of the circumstances"]; *In re Kenneth S.* (2005) 133 Cal.App.4th 54, 65-66 [considering the fact that the minor was brought to the police station by his foster parent as part of evaluation of totality of the circumstances].) We conclude that we must also consider a parent's conflict of interest, provided the conflict has some bearing on how a reasonable child would perceive the interrogation. (*Fare v. Michael C.* (1979) 442 U.S. 707, 725 (*Fare*) [in the context of juvenile *Miranda* waivers, "The totality approach permits—indeed it mandates—inquiry into all the circumstances surrounding the interrogation"].)

I.F. also argues that his father's conflict of interest rendered him incapable of providing "conflict-free advice and protection," resulting in a violation of I.F.'s rights under the Fifth, Sixth and Fourteenth Amendments. We acknowledge that B.F.'s conflict of interest made him an imperfect guardian of I.F.'s legal interests. We struggle, however, with I.F.'s suggestion that B.F.'s conflict of interest required the juvenile court to suppress all of the interviews as a matter of constitutional law.

The U.S. Supreme Court has spoken of the need to exercise "special caution" in assessing the voluntariness of juvenile *Miranda* waivers made in the absence of a parent, lawyer, or other friendly adult. (*In re Gault* (1967) 387 U.S. 1, 45, 55 [urging that "the greatest care" must be taken to ensure that a juvenile confession is voluntary, "in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair"]; see *Gallegos v. Colorado* (1962) 370 U.S. 49, 53-55 [observing that "a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. . . . [¶] . . . He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights"]; *Haley v. Ohio, supra,* 332 U.S. at pp. 599-

31

601 [concluding that a juvenile confession was involuntary under the totality of the circumstances, including the fact that the juvenile "had no friend or counsel to advise him"].) But the Court has not said that the absence of a friendly adult is enough, in and of itself, to require suppression of a juvenile confession. Rather, the Court has held that the presence or absence of a friendly adult must be considered as part of the totality of the circumstances analysis. (*Fare, supra,* 442 U.S. at p. 725.)

None of I.F.'s authorities support an exclusionary rule for statements by minors with conflicted parents, even in the "inherently coercive" setting of custodial interrogation. (*J.D.B., supra,* 564 U.S. at p. 269.) *Little v. Arkansas* (1978) 435 U.S. 957 (*Little*), on which I.F. relies, addresses the problem of parental conflicts of interest in a dissent from the high court's denial of certiorari. There, the minor, a 13-year old girl of "low dull normal" intelligence, confessed to the murder of her father following a brief meeting, alone, with her mother. (*Id.* at p. 957.) The mother, who had earlier been questioned by police and believed herself to be a suspect, emerged from the meeting, " '[looking] as if she had been crying,' " and told police the minor wanted to confess. (*Id.* at pp. 957, 958.) The minor was *Mirandized* and waived her rights. (*Id.* at p. 958.) She was then convicted and sentenced to life in prison. (*Id.* at p. 957.)

The Court denied certiorari over the dissent of Justice Marshall, who was joined by Justice Brennan. (*Little, supra,* 435 U.S. at p. 957.) In his dissent, Justice Marshall explained that he would have granted the petition "to resolve the question whether, before a juvenile waives her constitutional rights to remain silent and consult with an attorney, she is entitled to competent advice from an adult who does not have significant conflicts of interest." (*Ibid.*) In the present case, Justice Marshall observed, the mother was "plainly not in a position to provide rational advice with only the child's interests in mind, especially on the day of the murder." (*Id.* at p. 959.) Under the circumstances, Justice Marshall believed, "[the minor's] contention that there was no valid waiver of her rights deserves this Court's plenary consideration." (*Id.* at p. 961.)

I.F.'s reliance on *Little* is misplaced. As the People observe, statements accompanying denials of certiorari have no binding or precedential value. The Supreme Court itself has said that "all opinions dissenting from the denial of certiorari" are "totally unnecessary" and "examples of the purest form of dicta." (*Singleton v. Commissioner* (1978) 439 U.S. 940, 944-945 (Stevens, J., respecting the denial of certiorari).) Furthermore, in *Little*, though Justice Marshall was obviously troubled by the mother's conflict of interest, his dissent does not purport to offer guidance on evaluating such conflicts. Consequently, we have no way of knowing whether Justice Marshall would have endorsed a rule categorically excluding statements by minors with conflicted parents, as I.F. would have us do, or the totality of the circumstances test, or something else entirely. Regardless, we decline I.F.'s invitation to rely on *Little*.

*Fare* does not help I.F. either. In *Fare*, a 16 year old with an extensive criminal history was interrogated in connection with a murder investigation. (*Fare, supra,* 442 U.S. at pp. 709-710.) After being *Mirandized*, the minor asked to speak to his probation officer (*id.* at p. 710), which he subsequently argued was, in fact, an assertion of his Fifth Amendment rights (*id.* at pp. 711-712). A divided Court rejected the minor's argument over bitter dissent, stating, "it cannot be said that the probation officer is able to offer the type of independent advice that an accused would expect from a lawyer retained or assigned to assist him during questioning. Indeed, the probation officer's duty to his employer in many, if not most, cases would conflict sharply with the interests of the juvenile." (*Id.* at p. 721, citing *Miranda, supra,* 384 U.S. at pp. 480-481.) The Court concluded that the minor's *Miranda* waiver was voluntary and intelligent, despite the fact that the waiver was made without the presence of a friendly adult. (*Fare, supra,* at pp. 725-726.)

Far from requiring the presence of a conflict-free adult, *Fare* demonstrates that a juvenile *Miranda* waiver will be evaluated under the totality of the circumstances, regardless of the presence or absence of an adult. (*Fare, supra,* 422 U.S. at pp. 725-726;

see also King, *Waiving Childhood Goodbye: How Juvenile Courts Fail to Protect Children from Unknowing, Unintelligent, and Involuntary Waivers of Miranda Rights*, 2006 Wis. L.Rev. 431, 448 (noting that in *Fare*, "the Court abandoned reliance on adult guidance as the measure of the admissibility of a juvenile's statement in favor of the 'totality of the circumstances' "]; and see *People v. Lara* (1967) 67 Cal.2d 365, 383 ["[A] minor has the capacity to make a voluntary confession . . . without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with . . . other circumstances"].) *Fare* does not support a categorical rule excluding statements by minors with conflicted parents.

"A minority of states responded to *Fare* by putting in place, via case law and legislation, certain additional procedural 'safeguards' which must be adhered to in order for statements made by a juvenile during interrogation to be admissible." (Farber, *supra,* 41 Am. Crim. L.Rev. at p. 1287; see also *In re Joseph H., supra,* 367 P.3d at pp. 4-5 (dis. statement of Liu, J.) [collecting cases and statutes].) One such state was West Virginia, from which *In the Matter of Steven William T.* (1997) 201 W.Va. 654 [499 S.E.2d 876] (*Steven William T.*) originates.

I.F. offers *Steven William T.* for the proposition that a minor has an independent right to the advice and protection of a conflict-free adult during custodial interrogation, separate and apart from the right to be free of coercive interrogation tactics. However, the West Virginia court's decision turned on a statute "requiring the presence and consent of a parent or custodian for the taking of the statement of a juvenile under sixteen-years-old." (*Steven William T., supra,* 499 S.E.2d at p. 884, citing West Virginia Code § 49-5-

34

2(1) (1996).) California has no such statute.[10] Consequently, we have no basis on which to recognize a comparable right. I.F.'s reliance on *Steven William T.* is unavailing.

I.F. has not cited, and we have not found, any authority that would support an exclusionary rule for statements by minors with conflicted parents, even in the context of a juvenile *Miranda* waiver. In the absence of any such authority, we apply the usual "in custody" analysis, factoring B.F.'s conflict of interest into our examination of the totality of the circumstances. (*People v. Moore, supra,* 51 Cal.4th at p. 395.) The totality of the circumstances approach, though far from perfect, allows courts to assess the impact of a parent's conflict of interest on a case-by-case basis. As we have suggested, there are an infinite variety of parental conflicts of interest, and some will naturally have a greater impact than others. And even the same conflict of interest may present itself in different ways, depending on the circumstances. As we shall see, B.F.'s conflict of interest was not uniformly coercive, but rather, assumed a coercive character as the investigative focus on I.F. intensified.

D.    *The Interviews*

Having reviewed the relevant legal principles, we now consider the four sets of statements said to have been improperly admitted: (1) the statements made during the first interview at the hospital on April 27, 2013, (2) the statements made during the second interview at the district attorney's office on April 27, 2013, (3) the statements made during the third interview at the district attorney's office on April 29, 2013, and (4) the statements made during the fourth interview at the district attorney's office on May 9,

---

[10] We note, however, that the Governor recently signed Senate Bill No. 395 (2017-2018 Reg. Sess.), which adds section 625.6 to the Welfare and Institutions Code, requiring a minor age 15 years or younger to consult with legal counsel prior to a custodial interrogation and before any waiver of *Miranda* rights. (Welf. & Inst. Code, § 625.6, subd. (a).)

35

2013.  In evaluating the circumstances surrounding each interview, we are mindful of the fact that I.F. was not a seasoned juvenile delinquent.  In fact, he does not appear to have any experience with the criminal justice system prior to the day of the murder.

### 1.       *The First Interview Was Noncustodial*

I.F. argues that a reasonable 12 year old would not have believed he was free to leave the first interview.[11]  He emphasizes that the interview took place in an "enclosed entryway" which "is locked from the outside, with entry via keypad."  He also notes that Whitney asked B.F. for permission to conduct the interview, but does not appear to have asked him.  He also notes that Whitney does not appear to have told him he was free to leave.  While these factors weigh in favor of a finding that I.F. was in custody at the time of the first interview, other factors more convincingly support the opposite conclusion.

Of greatest significance, the interview took place in an airlock vestibule, a transitional space that necessarily connotes ingress and egress.  Here, though ingress may have been restricted to law enforcement and emergency personnel, nothing in the record suggests that egress was so restricted.  To the contrary, Whitney testified that both sets of doors—the exterior doors leading to the ambulance bay and the interior doors leading to the emergency room—were open and unlocked.  B.F., for his part, testified that the first interview was repeatedly interrupted by people coming and going.  As B.F. explained, "the first interview [Whitney] was doing kept getting interrupted, people ke[pt] coming in and out of that little airlock, whatever they keep calling it."  As a result, B.F. continued, "it was a short—it was a short questioning by Detective Whitney.  They didn't have a lot

---

[11] We reject the People's contention that I.F. forfeited his challenge to the admission of the first interview by failing to raise the issue in the juvenile court.  Contrary to the People's suggestion, I.F. sought to exclude the first interview by means of both motions to suppress, including the *Miranda* motion currently before us.

of time.  Like I said, a lot of people coming in and out, so it wasn't a real extensive questioning from him."

I.F. argues that B.F. only consented to the interview because he believed, based on prior contacts with law enforcement, that "[a]nytime you're told to do something by the cops, it's an order."  As previously discussed, the "in custody" test for *Miranda* purposes is an objective one.  (*People v. Pilster, supra,* 138 Cal.App.4th at p. 1403.)  We do not consider the " 'subjective views harbored by either the interrogating officers or the person being questioned.' " (*Yarborough v. Alvarado, supra,* 541 U.S. at p. 663.)  We likewise decline to consider B.F.'s stated belief that he was powerless to refuse law enforcement's requests.

Although we do not consider B.F.'s subjective beliefs, we consider B.F.'s conduct, for the reasons previously stated.  At the time of the first interview, I.F. asserts, "[B.F.] was cooperating in the attempt to find the person who murdered his daughter."  Although B.F.'s cooperation would later take on a different cast, he does not appear to have pressured I.F. to participate in the first interview or otherwise conducted himself in a manner that contributed to the creation of a coercive atmosphere.  If anything, B.F.'s role in the first interview was neutral.

Relying on *Elias V.,* I.F. argues that the interviews as a whole were custodial because police used the "Reid Technique," an interrogation method that has been linked to a high number of false confessions.  (*Elias V., supra,* 237 Cal.App.4th at pp. 579-580 [describing the Reid Technique]; see also Birckhead, *The Age of the Child:  Interrogating Juveniles After Roper v. Simmons* (2008) 65 Wash. & Lee L.Rev. 385, 408-409 [discussing correlation between use of the Reid Technique and incidence of false confessions in juveniles]; and see LaMontagne, *Children Under Pressure:  The Problem of Juvenile Confessions and Potential Solutions* (2013) 41 W. St. U. L.Rev. 29, 43-45 [same].)  *Elias V.* involved a constitutional challenge to the voluntariness of a juvenile confession.  (*Elias V., supra,* at p. 577.)  The court considered the use of the Reid

37

Technique in concluding the confession was involuntary, describing such psychological tactics as "maximization," which is designed to convey " 'the interrogator's rock-solid belief that the suspect is guilty and that all denials will fail,' " and "minimization," which is designed to " 'provide the suspect with moral justification and face-saving excuses for having committed the crime in question.' " (*Id.* at p. 583.) We are not convinced that the court's discussion of specific interrogation techniques assists our analysis here. After all, a juvenile confronted with "minimization" or "maximization" techniques may or may not feel free to terminate the interview and leave, for reasons having nothing to do with the use of the Reid Technique. We therefore focus on the overall tone and tenor of the questioning, rather than the particular interrogation techniques that may have been used.

I.F. argues that the interviews were "lengthy, aggressive interrogations of someone the detectives believed had committed the murder." But the first interview was only 16 minutes long, and the overall tone of the questioning was low-key and conversational. On this record, where the interview was conducted in the relatively public setting of the entrance to the emergency room, with people coming and going, a reasonable 12 year old subject to non-confrontational questioning by a single officer would feel free to terminate the interview and leave. The juvenile court properly denied the motion to suppress the first interview.

2.     *The Second Interview Was Noncustodial*

Next, I.F. argues that a reasonable 12 year old would not have believed he was free to leave the second interview because (1) B.F. agreed to the interview, raising an inference that he expected I.F. to answer questions, (2) I.F. was separated from B.F., increasing I.F.'s sense of isolation and heightening his anxiety, (3) police used coercive interrogation methods on I.F., asking him unnecessary and intrusive questions about his activities on the morning of the murder, and (4) questioning continued for 10 minutes after B.F. asked Whitney and Sims to "wrap it up," suggesting that even a determined

38

adult would not have had the ability to terminate the interview and leave. We address these arguments seriatim.

We are sympathetic to I.F.'s argument that a reasonable child, having been delivered to police by a parent with the understanding that questioning would ensue, would anticipate that the ensuing interrogation would be custodial, regardless of the parent's contrary understanding.[12] As we shall discuss, B.F.'s understanding of the nature of the interviews, though relevant, is not dispositive of the ultimate issue of whether a reasonable 12 year old would have understood he was free to leave. (See Section II.D.3, *post.*) But even assuming arguendo that I.F. expected to be subjected to custodial interrogation when he arrived at the district attorney's office, he was immediately informed that, "both of these doors are open, you are not under arrest, you're not being detained, you're here on your [own] free will." He was then told that he could "get up" and "walk out anytime." These admonitions, which I.F. appears to have heard and understood, would have alerted a reasonable 12 year old that he was free to terminate the interview and leave. (See, e.g., *In re Kenneth S., supra,* 133 Cal.App.4th at p. 66 [minor brought to the police station by foster parent and "immediately informed that he was not under arrest and was free to leave" was not in custody for purposes of *Miranda*].) And lest there was any doubt as to I.F.'s freedom of movement, the sight of a cat entering (or attempting to enter) the interview room moments later would have

---

[12] Relying on Welfare and Institutions Code section 601, subdivision (a), I.F. argues that he was legally required to obey B.F.'s "reasonable and proper orders." We take I.F.'s point that B.F. exercised significant authority and control over him. (*Brekke v. Wills*, *supra,* 125 Cal.App.4th at pp. 1410-1411.) We do not understand I.F. to argue that Welfare and Institutions code section 601 has any other relevance to the "in custody" analysis. To the extent I.F. does so argue, we treat the argument as waived. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [conclusory presentation in brief without argument or application of pertinent law to the circumstances of the case was inadequate, and unsupported contentions would be deemed waived].)

reassured a reasonable child that his movements were not restricted. Thus, even assuming that B.F.'s behavior could have led a reasonable child to expect that the interrogation would be custodial, Whitney's admonition would have reassured the same child that he was free to terminate the interview and leave.

We reject I.F.'s contention that a reasonable child would have experienced the second interview as custodial by virtue of having been temporarily separated from his father. Here, though B.F. was not allowed to join I.F. in the interview room, he watched the interview from the adjoining observation room. Whitney showed I.F. the open door leading to the observation room, let I.F. know that B.F. was watching on the monitors, and invited I.F. to take a break to speak with B.F. if he wished. Thus, I.F. would have understood that B.F. was accessible and available, if needed. On this record, we conclude that a reasonable child in I.F.'s position would not have experienced the separation from his parent as custodial. (See *In re Kenneth S., supra,* 133 Cal.App.4th at pp. 59 and 65 [no custody where, with foster parent's consent, minor was interviewed alone in a small room at the police station with a partially open door, and foster parent seated 10 feet away].)

We likewise reject I.F.'s contention that the second interview was custodial due to the nature of the questioning. Arguing that the interviews as a whole were "increasingly aggressive, confrontational, and accusatory," I.F. claims that Whitney asked unnecessary and intrusive questions regarding his activities on the morning of the murder. Although Whitney asked I.F. about the movie he watched and his activities in the bathroom, these questions followed naturally from I.F.'s account of the events of the morning, and were necessary to establish a timeline for the murder. Having reviewed the video recording, we conclude that Whitney's tone was professional and appropriate. Although some of the questions may have caused a reasonable child to experience momentary embarrassment, they would not have caused such a child to experience a restraint on freedom tantamount to a formal arrest.

40

Finally, we reject I.F.'s contention that a reasonable child would have experienced the second interview as custodial because questioning continued for approximately 10 minutes after B.F. asked Whitney and Sims to "wrap it up." Our review of the record reveals that B.F.'s interruption, though determined, was more in the nature of a request to bring the questioning to a conclusion within a reasonable time, rather than a demand to terminate the interview immediately.[13] That questioning continued for another 10 minutes was consistent with the open-ended nature of B.F.'s request, rather than a signal that B.F. was powerless to terminate the interview. A reasonable child would not interpret the continued questioning as an indication that the second interview was custodial, notwithstanding Whitney's unambiguous assurances to the contrary.

Based on our independent review of the totality of the circumstances, we conclude a reasonable child in I.F.'s position, having heard Whitney's admonition that he was free to leave, having been assured that his father was in the next room, and having seen a cat enter (or attempt to enter) the interview room, would understand that he was free to terminate the interview and leave. The juvenile court properly denied the motion to suppress the second interview.

### 3. The Third Interview Was Custodial

Next, I.F. argues that a reasonable 12 year old would have believed the third interview was custodial because (1) his father agreed to the interview, raising an inference that he expected I.F. to answer questions, (2) I.F. was separated from his parent, increasing I.F.'s sense of isolation and heightening his anxiety, and (3) Sturm and

---

[13] On the video recording, B.F. can be heard saying, "Can we wrap it up? I know you guys have got some questions. (inaudible) they got." Whitney responds, "We're almost there," and B.F. continues, "Okay cuz I got a couple kids in Stockton[,] there's still a lot of chaos to deal with tonight [¶] . . . [¶] and it's getting late and I want (inaudible) hospital. I . . . I mean you guys are doing fine I don't . . . you know what I mean? Nothing about that I just . . . it's getting late it's been over an hour already."

41

Crabtree used coercive interrogation techniques. The People respond that (1) the family appeared at the district attorney's office voluntarily, (2) the doors of the interview room were unlocked, (3) I.F. was offered an opportunity to leave the interview room during a break, (4) B.F. came in and out of the adjoining observation room and was admitted into the interview room, and (5) the tone of the interview was friendly. Having independently considered the totality of the circumstances surrounding the third interview, we conclude that a reasonable 12 year old in I.F.'s position would not have felt free to leave.

As previously discussed, the family arrived at the district attorney's office on April 29, 2013, expecting to sign some papers and be on their way. Upon arriving, they were asked to wait. Although B.F. testified he understood he was there voluntarily, nothing in the record suggests that I.F. shared B.F.'s understanding. Because the ultimate issue is whether a reasonable child in I.F.'s position would have understood he was free to leave, we cannot impute B.F.'s subjective understanding of the circumstances of the interview to I.F. (See *U.S. v. IMM* (2014) 747 F.3d 754, 767.)

While waiting, Sheriff Kuntz appeared and asked B.F. for permission to take I.F. to the now vacant family home for a walk-through of the crime scene. B.F. asked I.F. if he wanted to go, and I.F. declined. Later, Whitney appeared and explained that police wanted to reinterview I.F. This time, I.F. was not asked what he wanted to do. Instead, B.F. agreed to the request, instructing I.F. to "speak clearly" during the interview. Standing alone, B.F.'s role in accepting the request and instructing I.F. to "speak clearly" do not lead us to believe that he placed undue pressure on I.F. to participate in the interview. Nevertheless, having been offered a choice with respect to the walk-through, it is unlikely that a reasonable 12 year old would have felt free to refuse the interview, as to which no choice was offered.

42

The third interview was conducted in the now familiar interview room, by two uniformed officers.[14]  Although Crabtree and Sturm were not armed, they nevertheless had an unmistakable police bearing.  The doors to the interview room were closed. Although the doors may have been unlocked, nothing in the record indicates I.F. was informed of this fact.  Furthermore, though Crabtree and Sturm offered to open the door during a break and invited I.F. to step outside, they never said anything to suggest that he was free to terminate the interview and leave.[15]  If anything, Crabtree and Sturm's assurances, such as they were, would have led a reasonable 12 year old to believe that he did not have the right to leave the interview room, except to "step outside" momentarily. Likewise, Crabtree and Sturm's assurances that I.F. would be allowed to leave with his family when the interview was over would have led a reasonable 12 year old to believe he had no right to leave before the interview was over, or decide for himself when the interview would end.  Crabtree and Sturm's failure to inform I.F. that he was free to terminate the interview and leave strongly supports the conclusion that the third interview was custodial.

During the questioning, Crabtree and Sturm repeatedly alluded to "things that we know," hinting that they had forensic evidence tying I.F. to the crime.  They urged I.F. to "tell the truth" and admit his "mistake."  They challenged his account of the morning of the murder, saying, "There is no man that ran out of that house is there?"  Although

_____

[14]  The People argue that, "The interview room was kid-friendly, featuring several posters of famous Disney cartoon movies."  To the contrary, the video recording reveals that the interview room featured movie posters from classic films such as Casablanca and Gone With The Wind.

[15]  In denying I.F.'s *Miranda* motion, the juvenile court found, "[I.F.] repeatedly was told in each of these four interviews that he could terminate at any time, he could leave at any time he wanted."  As we suggest in the text, the juvenile court's finding, so far as the third interview was concerned, was not supported by substantial evidence.

Crabtree and Sturm were courteous and polite, even sympathetic, their questions clearly manifested a belief that I.F. was culpable and they had evidence to prove it. (*Aguilera, supra,* 51 Cal.App.4th at p. 1162.) A reasonable 12 year old, confronted with the possibility that police viewed him as a suspect, would not have felt free to terminate the interview and leave.[16]

The People argue that the third interview was noncustodial because B.F. "was in and out of the adjacent observation room with Captain Macedo," and "knocked on the door to the interview room and was granted access." The People also observe that Crabtree and Sturm terminated the interview at B.F.'s request. The People mischaracterize the record. Although B.F. may have been in the observation room for part of the third interview, the record suggests that he was outside, and unavailable, for most of it. Similarly, though B.F. knocked on the door of the observation room and was eventually granted access, the record reveals that he was locked out, and forced to knock several times. And, though Crabtree and Sturm ultimately terminated the interview at B.F.'s request, the record can be fairly read to suggest that B.F. was prevented from making the request earlier by virtue of the fact that he was locked out. These restrictions on B.F.'s freedom of movement, if known to I.F., might reasonably have led a 12 year old in I.F.'s position to feel more restricted than otherwise. We therefore reject the People's contention that B.F.'s conduct somehow demonstrates the noncustodial nature of the interview.

---

[16] I.F. also argues that Sturm and Crabtree used the "minimization" and "maximization" tactics associated with the Reid Technique in the third interview. (See *Elias V., supra,* 237 Cal.App.4th at p. 583 [discussing the "minimization" and "maximization" tactics].) Although we perceive elements of the Reid Technique in the third interview, we reiterate that *Elias V.* concerned the voluntariness of a juvenile confession, not the "in custody" question before us. Rather than concern ourselves with specific interrogation techniques, we focus on the overall tone and tenor of the questioning, and whether or not they would have led a reasonable child to believe his liberty was restrained.

Based on our independent review of the totality of the circumstances, we conclude that a reasonable 12 year old in I.F.'s position, having been offered no choice as to whether to participate in the interview and having received no assurance that he was free to leave, would have perceived the interview as custodial. The juvenile court should have granted I.F.'s motion to suppress the statements made during the third interview.

### 4. *The Fourth Interview Was Custodial*

Next, I.F. argues that the fourth interview was custodial because (1) his father agreed to the interview, raising an inference that he expected I.F. to answer questions, (2) I.F. was separated from his parent during the first part of the interview, increasing I.F.'s sense of isolation and heightening his anxiety, (3) police used coercive interrogation methods on I.F., and (4) his father repeatedly urged I.F. to confess during the second part of the interview, thereby contributing to the creation of a coercive atmosphere. The People respond that (1) the family appeared at the district attorney's office voluntarily, (2) Crabtree told I.F. he was free to leave and I.F. demonstrated that he understood he was free to leave by leaving with C.W., (3) Crabtree told B.F. and I.F. that they were free to leave when they returned for the second part of the fourth interview, and (4) B.F. exercised control over the second part of the interview, suggesting that the interrogation was not dominated by police. A reasonable 12 year old in I.F.'s position would have experienced both parts of the fourth interview as a restraint on his liberty, albeit for different reasons.

### a. *The First Part of the Fourth Interview*

The fourth interview was the subject of extensive negotiations before anyone set foot in the interrogation room. As noted, Macedo telephoned C.W. on May 8, 2013, seeking permission to interview the children out of the presence of their parents. B.F. and C.W. agreed to the interviews, on the condition that one or the other must be allowed to observe. Despite the concern for who would speak with I.F., and on what terms, no one appears to have asked I.F. whether he wanted to be interviewed.

45

B.F. and C.W. met with Macedo and Campion at the district attorney's office on May 9, 2013. Campion renewed the request to interview the children out of the presence of parents, prompting an indignant B.F. to remind law enforcement officers that "he knew he didn't have to be there, that he chose to be there on that date and bring his family down, [and] that he could leave any time." Shortly thereafter, B.F. got up and left the district attorney's office with his family. Macedo caught up with the family in the parking lot, and persuaded B.F. and C.W. to come back so the interviews could proceed as originally agreed, only without Campion. Although B.F. clearly understood that he was free to leave, nothing in the record suggests that I.F. agreed to an interview, understood the interview to be voluntary, or understood B.F.'s role in making the necessary arrangements. As previously discussed, we cannot impute B.F.'s understanding of the circumstances of the interview to I.F. (*U.S. v. IMM, supra,* 747 F.3d at p. 767.) So far as the record reveals, from I.F.'s perspective, he was brought to the district office by B.F. and C.W., then told he was leaving, and then told he was staying. Far from suggesting freedom of movement, these abrupt and evidently unexplained changes in plan would have convinced a reasonable child that he had no choice but to go along with whatever course might be set for him by adults.

As C.W. was walking towards the trailer, she turned, expecting to see I.F. following her. Instead, she saw two law enforcement officers flanking I.F. and walking him around the building. Although I.F. was not handcuffed or escorted at gunpoint, C.W. was sufficiently unnerved that she was moved to call out, " 'Where are you guys taking him?' " The officers responded that they were taking I.F. to the trailer by means of a different entrance. A reasonable 12 year old in I.F.'s position would have experienced the unexpected separation from an adult ally as a restraint on freedom.

Once inside, I.F. was introduced to an FBI agent, Dilland, who instructed him, "If you don't want to answer a question, just tell me. 'Sam I don't want to answer it.' That's fine. Okay? If you don't know an answer say, 'Hey I don't . . . I don't know' and that

46

. . . and that's fine also." Dilland's admonition would have reassured a reasonable 12 year old that he could decline to answer specific questions; it would not have assured a reasonable 12 year old that he was free to terminate the interview and leave. If anything, by telling I.F. that he could refuse to answer specific individual questions, Dilland created the impression that he could not refuse to answer any and all questions, suggesting that I.F. was required to submit to questioning generally.

After approximately 30 minutes of small talk, Crabtree told I.F., "You know there's a door there and you know that door's open so [¶] . . . [¶] if you want bam, you just [¶] . . . [¶] leave you alone." Although Dilland repeatedly sought and received confirmation that I.F. understood he had the ability to refuse to answer specific questions, and had the ability to pose questions himself, neither Dilland nor Crabtree sought confirmation that I.F. understood the significance of the open door, or the ambiguous invitation to "bam, you just [¶] . . . [¶] leave you alone." We reiterate that Crabtree delivered the invitation over crosstalk by Dilland, and note that the entire exchange consumed approximately six seconds of a 97-minute interview. We question whether Crabtree's delivery was reasonably calculated to command a young person's attention. Regardless, a reasonable 12 year old, having been told in an earlier interview that he was free to "step outside," would not have understood the invitation to "bam, you just [¶] . . . [¶] leave you alone" to mean that he was free to terminate the interview and leave.

During the questioning, Dilland and Crabtree repeatedly challenged I.F.'s account of the morning of the murder, stating, "we have a lot of evidence pointing to another story." Although Dilland and Crabtree were polite and friendly, their questions manifested a belief that I.F. was culpable and they had the evidence to prove it. (*Aguilera, supra,* 51 Cal.App.4th at p. 1162.)

Towards the end of the first part of the fourth interview, Crabtree unambiguously told I.F., "You can go whenever you want, okay?" By then, however, the first part of the fourth interview was drawing to a close. Indeed, C.W. terminated the interview less than

47

one minute later. Significantly, C.W. asked law enforcement to end the interview several times, without success. Although C.W. was able to seize the initiative and end the interview herself, we doubt that a reasonable child would have been able to muster the same resolve. Certainly, to the extent he was aware of it, a reasonable child would have interpreted law enforcement's muted response to C.W.'s attempts to end the interview as an indication that he was not free to leave.

Having carefully reviewed the video recording and transcript, we conclude that a reasonable 12 year old in I.F.'s position would not have felt free to terminate the first part of the fourth interview and leave. Applying the *Aguilera* factors, I.F. was brought to the district attorney's office by B.F. and C.W., he was not given a choice whether to participate in the interview, he was escorted to the interview room by law enforcement, he was not clearly informed that he was free to terminate the interview and leave until the first part of the interview was nearly over, he did not indicate an awareness of any such freedom, and he was interrogated for 97 minutes by an FBI agent and detective who manifested a belief that he was culpable and they had the evidence to prove it. It is true, as the People observe, that I.F. was not handcuffed or held at gunpoint. It is also true that one of the doors to the interview room appears to have been open for some period of time, and detectives spoke to I.F. in sympathetic and respectful tones. Nevertheless, our independent examination of the totality of the circumstances convinces us that they combined to create a coercive atmosphere that a reasonable 12 year old in I.F.'s position would have experienced as a restraint tantamount to an arrest. (*Aguilera*, *supra,* 51 Cal.App.4th at p. 1162.) The juvenile court should have suppressed the first part of the fourth interview.

> b.      *The Second Part of the Fourth Interview*

After terminating the first part of the fourth interview, C.W. and I.F. drove to the nearby Cal Works building. C.W. and B.F. spoke with Gordon while I.F. waited in the car. Gordon explained that evidence collected during the investigation pointed to I.F.,

and the only way to resolve the matter was to continue the interview. B.F. agreed to continue the interview, but only on the condition that he be the one to confront I.F. Gordon communicated B.F.'s terms to the investigative team at the district attorney's office, and all agreed that the interview would continue, with B.F. taking the lead. No one appears to have discussed this arrangement with I.F., and no evidence suggests that I.F.'s participation in the second part of the fourth interview was voluntary. To the contrary, the record reveals that when asked by B.F. if he wanted to go back and "get to the bottom of this," I.F. said he did *not* want to return to the interview room.

In the interview room, Crabtree assured the family that they would be leaving the district attorney's office together at the end of the interview. Crabtree also assured them that, "You're free to go at any point. You don't want to talk about anything, you just stop and get up and go." Moments later, Crabtree reiterated, "So you guys understand at any point you guys can get up and just walk out of here. Okay? No matter what happens, you guys are still gonna leave here. Okay? Do you understand that [B.F.]?" Once again, we question whether Crabtree's assurances were reasonably calculated to inform I.F. that he was free to terminate the interview and leave. We note that Crabtree's remarks consistently conflate the idea that I.F. would be leaving when the interview was over with the idea that I.F. was free to leave at any time, creating an ambiguity as to the terms on which I.F. might leave. We also note that Crabtree's remarks appear to have been directed towards B.F., not I.F. We conclude that a reasonable child in I.F.'s position might have understood that *B.F.* had the right to terminate the interview and leave, but would not have assumed that he possessed any such right, particularly in view of the fact that B.F. ignored his desire to discontinue the interview only moments before.

Following a thumbnail sketch of the evidence against I.F., Crabtree turned the floor over to B.F. B.F. then addressed I.F., stating, "Okay. This is the deal, they have evidence that it points back to you. So what I want to know or what I want us to talk about is that for some reason there was an accident and for some reason you, did hurt

49

your sister, you got to talk to him.  Now just tell him yes you did it and what the deal is.  We can't move forward with this, without you either admitting to it that you did it or they're gonna get their evidence together and they're still gonna come and [eventually] arrest you and it's gonna be a big scene.  We've talked at home before that whenever you're in trouble [it's] better if you tell the truth, and we can work through it, [all right]?  It's the same situation.  You know I love your sister very much and it hurts me.  You know I love you very much; I sacrificed everything to take care of you guys, right?  I don't understand how you could hurt your sister.  So like I said[,] if there's some kind of accident, if I . . . I don't know.  Basically, they have clothes, your clothes with blood on it, right?  And no proof that anybody else has entered our home.  So basically everything comes back to you.  Whether I did something wrong and you're mad at me, so you did it.  Or you just freaked out.  You did something we need to know, so they can get you help.  You won't spend the rest of your life in prison, but you'll have to be accountable for what happened.  Understand that?  [¶]  So can you talk to them and let um know if something happened?"  I.F. responded, "Yeah I do, but I don't . . . I don't remember doing it."

Moments later, an emotional B.F. said, "If it's bad enough I lose one kid, if you did this, then I'm gonna lose you for a while.  Okay?  I'm not saying I'm gonna hate you and never talk to you.  But I need to know why, if . . . if this is what's going on.  There's no proof of nobody being in the house but you and your sister.  Like I said, I told um don't arrest you unless they're a hundred percent positive.  So they're gathering evidence.  If it's something you did, you have to talk to um.  If you lie to me, and hide shit, you know that's when I don't support you right?  If [you're] honest and talk to um . . . I'll . . . I don't know if your family mad at you, if you're afraid that you're going to disappoint me, don't worry about none of that.  You know I love both you guys very much.  I've been telling you that for [years], right?  We're here to take care of you right or wrong.  Okay?  So you need to talk to them.  If you [did] something they need to know, so they can move forward.  Can't move forward until you talk to um.  And if you're adamant that

50

you swear one hundred percent you never did nothing, the evidence will prove whether you did or not. No matter what I say. Then they're not gonna be so nice to you and they're gonna come get you. Okay? So if there was a . . . a[n] argument with you and your sister, whether there was, whatever the case may be it doesn't matter. None of it, no matter what you guys argued, fought over or were upset about, none of it deserved this right? So if there was a problem you need to talk to um." I.F. responded, "There wasn't . . . I . . . I didn't do it. I know I didn't do it."

With that, B.F. yielded the floor to Crabtree and Dilland. Although B.F. may have entered the interview room thinking that he would be interrogating I.F., the video recording and transcript reveal that he ceded control of the interrogation to Crabtree and Dilland after approximately five minutes, most of which consisted of a lecture on the importance of honesty, rather than questioning. For most of the interview, B.F. sat on the sidelines, offering brief observations and tangential asides. Of greatest significance, B.F. continuously urged I.F. to "talk to them," "be honest," and "tell the truth." Indeed, B.F. urged I.F. to cooperate no less than seventeen times over the course of the 43-minute interview.

Although B.F.'s tone of voice was calm and supportive, and the questioning by Crabtree and Dilland measured and professional, we cannot conclude that a reasonable 12 year old in I.F.'s position would have felt free to terminate the interview and leave. To the contrary, our independent review of the video tape and transcript convinces us that a reasonable 12 year old, having been brought to the district attorney's office under protest and continuously urged to confess by a grieving parent, would have experienced a restraint tantamount to an arrest.

The People observe that B.F. exercised a significant degree of control over the second part of the fourth interview, adding that B.F.'s control demonstrates the noncustodial nature of the interrogation. The People's argument overstates B.F.'s control and turns a blind eye to his conflict of interest. As noted, B.F. controlled the interview

for approximately five minutes, ultimately relinquishing control to Crabtree and Dilland. Whatever his intentions may have been at the beginning of the interview, B.F. appears to have settled into the role of exhorting I.F. to respond to Crabtree and Dilland's questions. That is not to say that B.F.'s participation was unimportant. To the contrary, B.F.'s pleas for cooperation reveal the depth of his conflict of interest.

As we have discussed, B.F.'s interests as the father of a murdered child were significantly misaligned with I.F.'s interests as a suspect in a murder investigation. (See Section II.C, *ante*.) Although B.F.'s conflict of interest does not appear to have influenced the earlier interviews, he was clearly moved to participate in the fourth interview by an understandable need to make sense of his daughter's death. It seems to us equally clear that B.F.'s search for answers prompted him to urge cooperation with police, placing B.F. on a collision course with I.F.'s Fifth Amendment rights, and contributing to the creation of a coercive atmosphere. Far from demonstrating that the interview was noncustodial, B.F.'s participation would have convinced a reasonable 12 year old that he had no choice but to submit to questioning.

Relying on *Colorado v. Connelly* (1986) 479 U.S. 157 (*Connelly*), the People argue that B.F.'s participation does not implicate *Miranda* because "[B.F.] is not and never was an agent of the government in his search for the truth as to what happened to his daughter." We have no quarrel with the People's observation that *Miranda* protects against official coercion, and does not reach conduct by a private citizen like B.F. (*Id.* at p. 170 ["The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion"].) Although B.F. participated in the interview pursuant to an agreement with law enforcement, we likewise accept, if only for the sake of argument, the People's contention that B.F. was not acting as an agent of the police. (*In re Paul P.* (1985) 170 Cal.App.3d 397, 401 ["*Miranda* is applicable only to questioning by law enforcement officials, their agents and agents of the court while the suspect is in official custody"].) Where we part company with the People is in their suggestion that the

52

second part of the fourth interview was primarily a private conversation, rather than a police dominated interrogation.

*In re Eric J.* (1979) 25 Cal.3d 522 (*Eric J.*), on which the People rely, illustrates the distinction. In *Eric J.,* the minor was suspected of stealing roller skates from one roller skating rink, where he was employed, and selling them to another. (*Id.* at p. 526.) Davis, a uniformed police officer, met with Morris, the manager of the first rink. (*Ibid.*) Together, they drove to the second rink, where they met with Rhoda, a roller skating instructor. (*Ibid.*) Rhoda suggested they summon the minor to the meeting, which was held in her office. (*Ibid.*) During the meeting, Morris questioned the minor for 45 minutes to an hour, after which the minor confessed. (*Ibid.*) During the hearing on the minor's subsequent motion to suppress, Morris and Davis testified that "Morris questioned [the minor] on his own initiative, that the officer [Davis] did not suggest or arrange he do so, and that the officer, while present during the conversation between Morris and [the minor], did not participate in it." (*Ibid.*)

On appeal, the minor argued that his confession should have been suppressed because he did not receive a *Miranda* warning. (*Eric J., supra,* 25 Cal.3d at pp. 526-527.) Our supreme court disagreed, stating, " 'A private citizen is not required to advise another individual of his rights before questioning him. Absent evidence of complicity on the part of law enforcement officials, the admissions or statements of a defendant to a private citizen infringe no constitutional guarantees.' " (*Id.* at p. 527.) Complicity exists where the person questioning the defendant is acting "under any arrangements with the authorities, at their direction, or with their approval." (*In re Deborah C.* (1981) 30 Cal.3d 125, 131.)

Here, unlike *Eric J.*, the interview was initiated by law enforcement, not a private citizen. Although B.F. insisted on being present, nothing in the record suggests that he sought the interview in the first instance. Furthermore, though B.F. demanded a role, he did not control the interview, as Morris did. To the contrary, the record reveals that B.F.

addressed I.F. for five minutes, and then turned the questioning over to Crabtree and Dilland. Unlike Officer Davis, who passively observed as Morris questioned the minor in *Eric J.,* Crabtree and Dilland actively questioned I.F. Indeed, the most damning statement elicited during the interview—I.F.'s equivocal admission that, "I don't remember doing it. But I guess I did, I don't know"—was made in response to questioning by Dilland, not B.F. And, though B.F. may not have been an agent of the police, he questioned I.F. pursuant to an arrangement with authorities. (*In re Deborah C., supra,* 30 Cal.3d at p. 131.) In this respect, at least, law enforcement can be said to have been complicit in B.F.'s interrogation of I.F., such as it was. (Cf. *Eric J., supra,* 25 Cal.3d at p. 527.) At a minimum, a reasonable 12 year old, having been separated from B.F. during the preceding interviews, would have understood B.F.'s participation in the second part of the fourth interview to have been sanctioned by police. We therefore reject the People's argument that B.F.'s participation turned the fourth interview into a private conversation, beyond *Miranda's* reach.[17]

---

[17] We acknowledge that the Court of Appeal for the Fourth District, Division 2, reached a different conclusion in *In re Joseph H.* (2015) 237 Cal.App.4th 517, a case not cited by the parties. There, the minor argued that the presence of his stepmother (whom he accused at trial of inducing him to commit the crime) created a coercive atmosphere in a post-waiver interrogation. (*Id.* at p. 535.) The court reviewed the video tape and found that the minor "frequently looked to his stepmother for support," causing the court to conclude that her presence was not coercive. (*Ibid.*) Additionally, the court concluded, "the minor has not demonstrated any *police coercion,* a prerequisite to a finding of involuntariness, so this argument fails." (*Ibid.*)

In this case, by contrast, B.F.'s presence, however well-intentioned, was animated by his search for answers, which caused him to join police in pressuring I.F. to confess. Unlike the presence of the minor's stepmother in *In re Joseph H.,* B.F.'s presence was coercive, not supportive or neutral. Furthermore, as demonstrated in the text, B.F.'s presence was not the only factor that would have led I.F. to experience the second part of the fourth interview as custodial. We therefore conclude that *In re Joseph H.* is distinguishable.

As previously discussed, courts routinely consider the presence or absence of a parent in deciding whether a reasonable child would have felt free to terminate an interview and leave. (See, e.g., *Alvarado v. Hickman, supra,* 316 F.3d at p. 849; *In re Kenneth S., supra,* 133 Cal.App.4th at p. 66.) True, the presence of a parent is usually seen as a supportive factor, weighing against a finding that an interrogation was custodial. (*Alvarado v. Hickman, supra,* at p. 849.) But there is no reason the presence of a parent could not contribute to the creation of a coercive atmosphere, as B.F.'s presence did here. None of the People's cases so hold, and we decline to exclude B.F. from our consideration of the totality of the circumstances.[18]

---

[18] If anything, *Howes v. Fields* (2012) 565 U.S. 499 (*Howes*), on which the People rely, supports our conclusion that the presence of private parties may, in some circumstances, render an interrogation more coercive rather than less. There, the high court rejected a categorical rule that questioning an incarcerated prisoner in private outside the presence of fellow inmates necessarily amounts to a custodial interrogation requiring *Miranda* warnings. (*Id.* at p. 508.) In so doing, the court recognized that, outside the prison setting, "isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support. And without any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated." (*Id.* at pp. 512-513.) "By contrast," the court continued, "questioning a prisoner in private does not generally remove the prisoner from a supportive atmosphere. Fellow inmates are by no means necessarily friends. On the contrary, they may be hostile and, for a variety of reasons, may react negatively to what the questioning reveals." (*Id.* at p. 513.) Just as the presence of fellow inmates could contribute to a coercive atmosphere in a prison, so too could the presence of a conflicted parent contribute to the creation of a coercive atmosphere in a police station.

With the exception of *Eric J.*, discussed in the text, none of the People's other cases address the "in custody" analysis, as opposed to other aspects of *Miranda.*

Having carefully reviewed the video recording and transcript, we conclude that a reasonable 12 year old in I.F.'s position would have experienced the second part of the fourth interview as custodial.  The juvenile court should have suppressed it.

E.      *The Erroneous Use of I.F.'s Statements Was Not Harmless Beyond a Reasonable Doubt*

When statements are obtained in violation of *Miranda*, as they were in this case, the error is reviewed under the federal "harmless beyond a reasonable doubt" standard set forth in *Chapman, supra,* 386 U.S. 18.  (*People v. Johnson* (1993) 6 Cal.4th 1, 32, 33, disapproved on another point by *People v. Rogers* (2006) 39 Cal.4th 826, 879; *In re Z.A.* (2012) 207 Cal.App.4th 1401, 1422, 1423; *Aguilera, supra,* 51 Cal.App.4th at p. 1166.)

The People bear the burden of proving that the error was harmless under *Chapman*.  (*People v. Johnson, supra,* 6 Cal.4th at pp. 32-33.)  In applying this standard, " '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' "  (*Chapman, supra,* 386 U.S. at p. 23.)  "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the [trier of fact] considered on the issue in question."  (*Yates v. Evatt* (1991) 500 U.S. 391, 403, disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.)

We cannot say beyond a reasonable doubt that I.F.'s statements during the third and fourth interviews did not contribute to the juvenile court's finding that he was responsible for the murder of L.F.  (*Chapman, supra,* 386 U.S. at p. 23.)  The prosecutor emphasized the inconsistencies in I.F.'s statements in closing argument, calling particular attention to the "very interesting admissions" made during the third and fourth interviews, namely, (1) I.F.'s concession during the third interview that he "could have seen" L.F.'s bloody body before speaking with the 911 operator, (2) I.F.'s concession in the first part of the fourth interview that he "could have changed" his T-shirt, and (3)

56

I.F.'s concession in the second part of the fourth interview that, "I don't remember doing it. But I guess I did, I don't know."

The juvenile court was clearly struck by the inconsistencies in I.F.'s statements, noting, at the very beginning of its ruling, that I.F. had "given numerous inconsistent statements." Later, the juvenile court observed, "[I.F.] told several stories about what happened, none of which was a story about changing his shirt. During the last interview, he kind of concedes he changed his shirt. He is missing details. Why would he change his shirt?" The juvenile court found other evidence persuasive, including I.F.'s admissible statements to the 911 operator and Whitney, and the damaged knife containing L.F.'s DNA. But the juvenile court appears to have viewed all of the evidence, including the knife, through the lens of I.F.'s inconsistent statements. Indeed, the juvenile court's concluding remarks suggest as much: "There has been no dispute that this is the DNA belonging to [L.F.] hidden within that knife, it was exposed by the scientist. And that is the strongest evidence because the statements of [I.F.] just don't make sense to this Court."

Although the juvenile court properly relied on I.F.'s admissible statements to the 911 operator and Whitney, the court's comments make clear that the court also relied on I.F.'s inadmissible statements to Dilland and Crabtree during the first part of the fourth interview, and leave open the possibility that the court may have relied on I.F.'s inadmissible statements during the third interview and second part of the fourth interview. Under the circumstances, we cannot say that I.F.'s inadmissible statements were "unimportant" in relation to the prosecution's other evidence. Nor can we conclude beyond a reasonable doubt that their admission did not materially contribute to the juvenile court's finding that I.F. was responsible for the murder. Accordingly, we

conclude that the People have not shown that the admission of I.F.'s statements was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 23.)[19]

## III. DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are reversed. The matter is remanded for a new adjudication hearing consistent with the views expressed herein.

/S/

RENNER, J.

We concur:

/S/

MAURO, Acting P. J.

/S/

HOCH, J.

---

[19] In view of our disposition, we decline to address I.F.'s contention that the juvenile court erred in refusing to admit exculpatory polygraph evidence over the prosecution's objection. (See Evid. Code, § 351.1 ["Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results"]; see also *People v. Clark* (2016) 63 Cal.4th 522, 631 ["Evidence Code section 351.1 'generally bans the admission of polygraph test results in criminal proceedings' in the absence of a stipulation by the parties"].)